At Term beginning First Monday of November, 1901.

Hon. Francis T. Nicholls, *Chief Justice.*

Hon. Joseph A. Breaux,
Hon. Newton C. Blanchard,
Hon. Frank A. Monroe,
Hon. Olivier O. Provosty,

*Associate Justices.*

## No. 13,701.

### State of Louisiana vs. The New Orleans Water Works Company.

### SYLLABUS.

1. Where a private corporation, created under State law, misuses the franchises conferred upon it, with respect to matters which are of the essence of the contract between such corporation and the State, and the acts, or omissions, complained of, are wilful and repeated, and inflict injury upon the public, generally, they constitute just ground for the forfeiture of such franchises and the dissolution of the corporation.

2. The charter of the defendant company, being Act No. 33 of 1877, Extra Session, as amended by Act No. 43 of 1878, prohibits said company, in express terms, from charging higher rates for the water to be supplied by it than were charged by the City of New Orleans at the date of the passage of said act of 1877; and, as the evidence adduced in this case shows that the defendant has wilfully and persistently disregarded this prohibition, its charter and franchises are declared forfeited.

State vs. Waterworks Company.

### ON APPLICATION FOR REHEARING.

1. A private corporation, upon which has been conferred the exclusive privilege of supplying water to a large community for a number of years, upon condition that its charges shall not exceed those paid to the municipal corporation which preceded it in control of the works, and which is vested with possession and control of the books of the municipal corporation in which those charges are recorded, should preserve such books in safety, and failing, satisfactorily, to account for them, must be held guilty of negligence, and can derive no advantage from their loss.

2. In a suit by the State to have decreed forfeited the charter of such corporation for the violation of its prohibitions and the non-fulfillment of its obligations, records in suits, litigated between the corporation and members of the community affected, in which such violations and non-fulfillment, *quoad* the individual litigating, have been judicially ascertained and determined, are admissible in evidence as against the defendant.

3. So, also, the testimony of a witness given upon the trial of such a suit, between the corporation and a member of the community affected, may be admitted in evidence for the purposes of the suit brought by the State, though the witness, when placed on the stand, is unable to identify the type-written instrument purporting to contain such testimony, and, by reason of the lapse of years and advancing age, is unable to recall the facts to which he formerly testified, *provided;* that the instrument is otherwise identified as containing the testimony which had been given by the witness and the witness affirms that such testimony was true when given.

APPEAL from the civil district court, parish of Orleans—*Theard, Jr.*

*Walter Guion,* Attorney General (*Benjamin Rice Forman,* of Counsel), for Plaintiff, Appellant.

*Farrar, Jonas & Kruttschnitt, James R. Beckwith,* and *E. Howard McCaleb,* for Defendant, Appellee.

*Samuel L. Gilmore,* City Attorney, *Arthur McGuirk,* Assistant City Attorney, for City of New Orleans, Intervenor, Appellant.

*Branch K. Miller,* for Board of Liquidation, Intervenor, Appellee.

On the application for rehearing by MONROE, J.

Removed to Supreme Court of the United States on writ of error.

### STATEMENT OF THE CASE.

The opinion of the court was delivered by

MONROE, J. In 1898, the General Assembly adopted two concurrent

resolutions, which, by the approval of the Governor, became Acts Nos. 5 and 150, respectively, of the session of that year. Act No. 5 provides for the appointment of a legislative committee to investigate certain complaints against the New Orleans Water Works Company, and Act No. 150, after referring to the majority and minority reports, which had been made by the committee so appointed, and after a recital to the effect that said reports involve intricate questions of law and of fact, which it is impossible, for lack of time, for the General Assembly to determine, provides: "That the whole subject matter of said reports, together with the testimony and evidence upon which they are based, be respectfully referred to the Attorney General of the State, for such action in the premises as he may deem proper." Thereupon, in January, 1899, the Attorney General brought this suit, in the name of the State, praying, for the reasons set forth in the petition, that all the franchises of the said waterworks company be declared forfeited, or, in the alternative, that said company be decreed to have abandoned the monopoly, claimed and enjoyed by it, of furnishing water to the city of New Orleans and its inhabitants.

In the suit thus filed, the City, and the Board of Liquidation of the City Debt intervened, the one, joining in the prayer of the plaintiff, and the other, in that of the defendant. Both interventions were, however, disimssed, by the judge *a quo,* and the Board of Liquidation has taken no appeal. So that, the case with which we are called upon to deal is that between the State, the City and the defendant company, upon appeals, taken by the State and City from judgment rejecting their demands. The charges upon which those demands are predicated are, in substance; that the defendant has not complied with the obligations imposed by its charter with respect to the quality and quantity of water to be furnished; that it has violated certain provisions of said charter concerning the charging of rates for water, the payment of dividends, the sale of its stock, and the borrowing of money; and that it has abused its franchises by unjust discrimination in the rates charged. It is also alleged that the defendant has accepted the benefit of Act No. 56 of 1884, and has, thereby, and in any event, abandoned its monopoly. It is further claimed, in argument, and the question was passed on by the judge *a quo,* that the act incorporating the defendant is unconstitutional, because of the failure of its title to disclose the granting of said monopoly.

It appears from the record that, in 1833, the Legislature created a

corporation called the "Commercial Bank of New Orleans," the main purpose of which, as declared by its charter, though it was also vested with banking privileges, was to supply the city and the people of New Orleans with "water from the Mississippi river." The capital stock of the corporation was fixed at $3,000,000 (of which the city took $500,000), and the period of its existence at thirty-five years, with a *proviso* to the effect that, at the expiration of its charter, the city should have the right to purchase the plant, at a valuation to be determined by appraisement, and to pay for the same in bonds. The act contemplated that the water to be furnished should be obtained from the Mississippi river, and, in general, that it should be delivered as so obtained, but there was a clause reading, "and the said company shall supply a sufficient quantity of clear, pure and wholesome water for the use of the inhabitants, within the limits aforesaid, at the elevation of fifteen feet, when the same may be required" (Acts of 1833, p. 167, Sec. 38), from which it appears that the obligation was imposed upon the company to free the water of the material usually carried by it in suspension when specially so required by consumers. It does not appear, however, that during the thirty-five years of its existence any such requisition was made, or that the company ever furnished any other water, either to the city or its inhabitants, than the water of the river, as taken therefrom. In 1868, upon the expiration of its charter, the tangible property of the company, including lands, buildings, machinery, reservoirs, etc., was appraised, for the purposes of the sale to the city, at $2,000,000, which was, probably, twice or three times its value, but, as the price was paid in bonds which were worth much less than *par,* the profit to vendors was not so great as it would, otherwise, have been. The City, moreover, was a stockholder, to the extent of $500,000, and had to her credit, in the hands of the company, $106,600 of dividends which had been, from time to time, declared, and, these two amounts being deducted from the price, she issued her bonds for the balance, amounting to $1,393,-400; and, in January, 1869, the property was turned over to her and placed under the control of a Board of Commissioners and a Superintendent, appointed by, and acting under the authority of, the Mayor and Council. During the city's administration, which lasted from January, 1869, to April, 1878, the propriety of improving the quality of the water was constantly recognized, and various reports and suggestions upon the subject were made, but nothing was accomplished.

The works were, however, extended, and, when turned over to the defendant now before the court, in April, 1878, consisted, so far as facilities for distributing the water were concerned, of sixty-three miles 1794 feet of main pipes, of different dimensions. The question of the tariff of charges was also much considered by the city authorities, and, eventually, with more decisive results than followed upon their deliberations concerning the quality of the water. The Board of Commissioners, apparently before the works actually came into the possession of the City, had adopted a schedule, which has since been known as the "Hatch" tariff, no doubt, because promulgated over the signature of F. H. Hatch, as president *pro tempore* of said board. and the charges for water were regulated thereby immediately upon the City's acquisition of the works, and for some time thereafter. As early as February, 1869, a committee, appointed by the Board of Assistant Aldermen to look into the matter, made a report, in which they said: "Your committee on water rates, to whom was referred a resolution directing them to report a table of rates for water rents, have examined the rates now being charged and collected by the Board of Commissioners of the Water Works, and find them entirely too high, and a cause of general complaint among consumers of water. These rates are considerably higher than in many other well regulated cities." This was followed by a statement showing that in Cincinnati and Louisville the charges for water, furnished in large quantities, and by measurement, was 15 cents per thousand gallons, and in Chicago from 10 to 15 cents per thousand gallons, whilst the rates under the Hatch tariff were from 25 to 40 cents per thousand gallons, for water so furnished. And those rates were quite moderate, as compared to the "flat" rates charged to the small consumers. The Board of Commissioners, it appears, had endeavored, by the introduction of meters, to equalize this taxation, and, in April, 1869, General Bragg, the then superintendent of the works, reported upon the subject, in part, as follows, to-wit: "You are presented herewith with an abstract of the measurements of water delivered in the first quarter of this year by meter. * * * The results are so remarkable and extraordinary as to induce me to ask your special attention and scrutiny. They go to show the entire correctness of the principle on which you established your rates, viz, to make them uniform, and, though the result is not yet satisfactory, the small consumer still paying too much in proportion, you have made a long stride in the right direction. A few more

applications of the meter, now being made, will enable you to do full justice to all parties. * * * The large distillery, for instance, which received its water last year at two and nine-tenths cents per thousand gallons, now pays twenty cents for the same supply. *Per contra,* the poor laborer, or widow, who paid ninety cents last year, now gets the same allowance for forty cents. The large steam bakery, which paid only eighteen cents, last year, whilst his small neighbor paid eighty, is now put on an equality with the latter, the one being put up and the other put down to a medium. But the greatest contrast is to be found in the larger establishments. In the three large sugar refineries, one paid four and seven-tenths cents per thousand gallons, another, three and two-tenths cents per thousand gallons, and the third, and largest, one and four-tenths cents per thousand gallons. Here was a discrimination of more than three hundred per cent. against one man, in favor of another, engaged in the same commercial business."

"Just 15 per cent. of all the water that is paid for is taken now by five large consumers. Yet they have, heretofore, paid only 2 per cent. of the revenues. * * * The working of the meters, so far, goes to show that still further reduction may hereafter be made in the water rates, but, in justice, that reduction should inure almost entirely to the small consumer, until he is brought nearer an equality with his more fortunate neighbor." The committee appointed by the Council, nevertheless, as we have seen, found the Hatch tariff too high, and they recommend the adoption of a tariff, prepared by them, reducing the charges to about the rates established in the cities mentioned. And such a tariff was adopted by the Council, but was vetoed by the Mayor, and was, in March, 1870, passed over the Mayor's veto. Very soon after this action had been taken, the President of the Board of Commissioners addressed a communication to the Mayor and Council, in which, referring thereto, said: "As this tariff is to be put in operation when officially promulgated, the Board of Directors of these works have directed me to call your attention to the serious difficulties which must arise in its operation." He then called attention to the fact that, in December, 1869, a tariff (being the Hatch tariff) had been adopted, for the year 1870, upon the basis of which tariff, all the bills for the ensuing year had been made, and sent out, and that more than one-half of such bills had been paid; and he asked the following qeustions concerning the proposed new tariff, viz:

"1. Shall it go into effect immediately? 2. Is it to have· any retroactive effect? 3. If retroactive, does it work a change of bills not paid, only, or does it apply to those already paid? 4. As the money collected under the present tariff had already been appropri- refunded?" This communication was submitted to the Board of ated by you to pay interest ·on the waterworks bonds, how can it be Aldermen, March 15, 1870, up to which time, it is quite evident, the ordinance establishing the new tariff had not been promulgated. Upon the following day, March 16, 1870, the Governor of the state approved the Act No. 7, of the Extra Session of 1870, establishing a new form of government for the city of New Orleans, the concluding section of which provided that it should take effect from and after its passage. And nothing was thereafter done with the tariff ordinance, the evidence in the record being conclusive to the effect that it was never promulgated. Under the new city charter, the control ·of the waterworks was vested in an " Administrator of Water Works and Public Buildings," and the record contains the report of the first of the officers so designated, and also ·of the last. We learn from these reports, and from other evidence in the record, that, during the year 1868 (being the year preceding the acquisition of the Water Works by the city), there were pumped a total of 2,227,000,000 gallons of water, for which there were received $155,023.75, ·or an average of about 69.6 cents per 1000·gallons. What amount of water was pumped during 1869, the first year under the city's administration and under the Hatch tariff, the record does not show, but the receipts amounted to $143,293.00. During the year ending in May, 1871, there were pumped 2,101,015,000 gallons, for which the city received, under the Hatch tariff, $148,064.91, or an average of about 70 cents per thousand gallons. From that time, although the record does not show the quantity of water pumped during the several succeeding years, the falling off in the receipts indicates that the Hatch tariff was abandoned, and that the charges were being reduced below the rates thereby established. Thus, the receipts for 1872 were $132,626.82; for 1873, $125,904.17; for 1874, $113,146.61; for 1875, $100,742.01; for 1876, $90,015.67. During the year 1877 (being the last year of the city's administration of the works), there were pumped 2,408,591,230 gallons of water, and we find it stated in the report made by the president of the defendant company to his board of directors that the receipts for the year were $90,148.62, or an average of something over 37 cents per

thousand gallons. So that, between the second and the last years of the City's administration, there was a difference of more than 40 per cent. in the average amount received per 1000 gallons of water pumped, and a corresponding difference in the total receipts. That the City, in 1870-1871,collected for all the water pumped by it, including the free water furnished, an average of 70 cents per 1000 gallons, whilst the maximum rates under the Hatch tariff, was 40 cents per thousand, is to be accounted for by the fact, that the flat rates charged to the small consumers were enormously in excess of those predicated upon measurement, charged to the large consumers. Upon the other hand, the fact that the city, in 1870-1871, under the Hatch tariff, received $148,046.91, for a total of 2,101,015,664 gallons of water pumped, whilst, in 1877, she received but $90,148.62, for a total of 2,408,591,230 gallons pumped, amounts, almost, to a demonstration that the Hatch tariff had been abandoned. There is, however, further, direct, evidence, to the same effect, which will be more particularly referred to hereafter. The net receipts for water rents, under the city's administration, over and above the expense of maintaining, extending and operating the works, appears to have been devoted to the payment of interest on the bonds which had been issued in liquidation of the purchase price of said works, and the amount required to pay such interst, on all the bonds so issued, was $69,620.00. When, therefore, the total receipts fell to about $90,000.00, as they did in 1876, whilst the expense of maintaining and operating the plant was not far short of $60,000.00, it can readily be understood that the position of the holders of water works bonds was far from satisfactory. Under these circumstances, it seems not improbable that the General Assembly was induced to take action in the matter as a measure of relief to the holders of such bonds, though there is no direct evidence to that effect in the record. Be that as it may, in March, 1877, an act was passed (being Act No. 33 of 1877) entitled "An act to enable the City of New Orleans to promote the public health and to afford greater security against fire, by the establishment of a corporation, to be called the New Orleans Water Works Company; to authorize the said company to issue bonds for the purpose of extending and improving the said works, and to furnish the inhabitants of New Orleans an adequate supply of pure and wholesome water; to permit the holders of waterworks bonds to convert them into stock, and to provide for the liquidation of the bonded and floating debt of the city of New Orleans."

The provisions of this act, so far as it is necessary to refer to them, are, substantially, as follows, to-wit:

Section 1, fixes the capital stock at $2,000,000, divided into 20,000 shares of $100 each.

Section 2, requires that, upon the organization of the company, certificates representing the whole amount of the stock shall be turned over to the city to be disposed of as follows, to-wit:  (1) $606,600.00 to be retained as the property of the city (this it will be remembered being the amount of the city's interest, upon the basis upon which it purchased the works from the old company); (2) the city further to retain one share of stock for every $100 of waterworks bonds which it may have extinguished by payment, exchange, or otherwise;  (3) The residue of said stock to be held by the city for the benefit of the holders of such bonds, still outstanding, and exchanged for the same on the basis of one share of full-paid stock for every $100 of bonds, exclusive of the value of the overdue coupons

Section 3, provides that, whenever the holders of such outstanding bonds, to the amount of $500,000, shall have exchanged the same for stock, a board, consisting of seven directors, shall be elected, of whom, four shall be named by the Mayor, and three, elected by the stockholders other than the city, the board thus elected to hold office until July 1, 1878.

Section 4, provides for the transfer of the works by the city to the new company.

Section 5, confers upon the company the privileges acquired by the city from the Commercial Bank, and further provides that said company "shall. have, for fifty years from the passage of this act, the exclusive privilege of supplying the city of New Orleans and its inhabitants with water from the Mississippi river, or any other stream, or river, by means of pipes and conduits," authorizes the company to purchase, lease, and enter upon, lands, dig ditches and canals, and construct such dykes, reservoirs and other works "as may be required for securing and carrying a full supply of pure water to said city and its inhabitants," etc., etc.

Section 6 provides, that, upon the first Monday in July, 1878, and annually thereafter, four directors, shall be elected, by all the stockholders, and that the Mayor and the Administrator of Water Works and Public Buildings and the Administrator of Finance, shall be er officio, members of the board.

Section 8, provides, that the capital stock may be increased to two million dollars, for the purpose of enabling the company to improve and extend its works, the new stock to be paid for in cash, or in work.

Section 9, authorizes the company to "borrow money for the purpose of improving and enlarging its works, and increasing the supply of pure water," and, to that end, to issue bonds to an amount not exceeding $2,000,000, secured by mortgage on the property of the company, such bonds to be issued and sold, and such mortgages given, only with the consent of the city council.

Section 10, provides, "That said company shall not declare or pay any dividends except in cash, and then only out of the net semi-annual, or annual, receipts, after payment of the expenses of operation and the interest on its bonded debt, nor shall any dividends be declared until the contemplated works are completed and in use."

Section 11, provides, that the city shall have the free use of water, for the extinguishment of fires and for other public purposes, and that the company "shall place, free of any charge whatever, two hydrants, of the most improved construction, in front of each square where a main pipe shall be laid, from which, a sufficient quantity of water may be conveniently drawn for the extinguishment of fires and for other public purposes * * * * and, in consideration thereof, the franchises and property of the said New Orleans Water Works Company, used in accordance with this act, shall be exempt from taxation, state, municipal and parochial."

Section 12, confers upon the company the right to expropriate private property and to appropriate, and use, public property.

Section 13, reads: "That the said Water Works Company, immediately after its organization, shall proceed to the erection of new works and pipes, sufficient in capacity to furnish a full and adequate supply of water, to be drawn from the Mississippi river, or elsewhere, as may be judged most expedient; that said new works and pipes shall be commenced within twelve months from the passage of this act, and shall be, year by year, completed, so that, within five years from the passage of this act, they shall be completed so as to give an adequate supply of water to the people of the city of New Orleans, exclusive of the Fifth District. If the said work be not done as above prescribed, said corporation shall forfeit all exclusive privileges granted herein, and the city shalll have a right to contract with any one else for a supply of water, as above provided, and to expropriate the prop-

erty of the corporation hereby created. After the completion of the new works and pipes, the new company shall, from time to time, as the wants of the population may require, and when the estimated revenue upon the cost of such extension shall equal ten per centum, extend their works throughout the entire limits of the city and suburbs, and any future extension of said city; and any failure of said waterworks company to comply with this provision shall work a forfeiture of this charter.

\* \* \* \* \* \* \*

Section 15, provides, " That the said waterworks company shall " have the right to fix the rate of charges for water, provided that the " net profits of the company shall not exceed ten per centum per " annum; and shall publish *semi*-annual statements of its business and " condition; and that the city council shall have the power to appoint " a committee, of not less than five, who shall have access to the books " of said company, and make such extracts from the same as they may " deem necessary, and, in case the said profits shall exceed ten per cent, " the city council shall have the right to require said company to " reduce the price of water in such manner, and in such proportion, " that the profits shall not exceed the above named rates; and *provided* " *further,* that the rates charged shall never exceed the rates now paid " by" (to) "the city, and in case said company shall refuse compliance, " the demand of said city may be enforced by the writ of mandamus."

Section 16, makes it a criminal offence to obstruct the company or " its agents in conveying water to the city, or to injure the works, or " to pollute the water."

Section 17 provides, "That until other works are constructed by " which the present works may be dispensed with the same shall remain " under the control of the city council, and the superintendence " thereof remain in the hands of the Administrator of Water Works " and Public Buildings, but the said company shall be authorized to " collect the revenues thereof and apply them to the expense of operat- " ing and extending the works." And it is further provided, that the city shall have the right to buy the works of the company at the expiration of its charter.

Section 18 provides, "That nothing in this act shall be so construed " as to prevent the city council from granting to any person, or per-

" sons, contigious to the river, the privilege of laying pipes to the " river, exclusively for his own use, or their own use."

This statute failed of its purpose, and, in 1878, the General Assembly passed Act No. 43 of that session, entitled "An act relative to the charter of the New Orleans Water Works Company, amending Act No. 33 of Extra Session of 1877, approved March 31, 1877," which amends the act of 1877, in the following particulars, to-wit:

Section 1 provides, that four out of the seven directors shall be elected by the stockholders, other than the city.

Section 2, amends and re-enacts section 10 of the act of 1877, so as to make it read: "That said company shall not declare any dividends " except in cash, and then only out of the net *semi*-annual, or annual " receipts, after payment of the expenses of operation, and gradual " extension and the interest on its bonded debt."

Section 3, amends section 17 of said act by eliminating the *proviso* whereby the city is authorized to retain control of the present works until other works are constructed.

Section 4, provides, that the delay for beginning the erection of new works, shall begin to run six months after the organization of the company, instead of twelve months after the passage of the act of 1877, as provided in that statute.

Section 5, reads: "That the full, complete and adequate supply of " water, referred to in section 13 of said act, No. 33 of 1877, shall be " so construed as to require a supply of water at the height of not less " than fifteen feet from the ground, wherever the pipes of the water " works now exist."

Section 6, withdraws the exemption, in so far as State taxation is concerned.

Under the act of 1877, then, as thus amended, the defendant company was organized, and, upon March 30th, 1878, elected its first board of directors. Upon April 9th, following, the city, by notarial act. transferred to it the entire water works property and plant. It appears from the recitals of this act that the stock of the company was then distributed as follows, to-wit:

1. Amount of full-paid stock, subscribed for by the city
   as per the terms of the act of 1877................$  606,600  00
2. Amount issued to the city on account of Water
   Works bonds funded in premium bonds ............  451,400  00

3. Amount issued to the city for Water Works bonds
   redeemed ....................................... 111,500 00
4. Amount issued to holders of Water Works bonds, in
   exchange therefor .............................. 501,600 00
5. Amount reserved for the benefit of the holders of
   such bonds, still outstanding ..................... 328,900 00

Total ...........................................$2,000,000 00

The evidence shows that the bonds in question, and the stock for which they were exchanged, were, at that time, worth 33 cents on the dollar. It further shows that, in April, 1879, one year after going into business, the company, upon a basis of $99,717.92, received for water rents, declared a dividend of 2 per cent upon the par value of its stock, amounting to 6 per cent. on the money actually invested, and that, besides adding largely to the extent and value of its property, it has, from that time to the present, with the exception of one year, paid dividends, amounting, for some years past, to five per cent. per annum, upon the par value of its stock, or about fifteen per cent. on the original investment, and that as a consequence the stock has been sold as high as 128, and, in exceptional cases, even higher, and was quoted considerably above *par* during the trial of this case in the district court.

The company, whilst, apparently, holding that it is under no compulsion to furnish clear, or pure, water, at any time during the fifty years of life which it has received, nevertheless, seemed, for a while, to consider that some sort of obligation rested upon it in the premises; and its officers, from time to time, have made reports in which they have recognized the fact that the water, as actually furnished, is unfit for most purposes for which water is used, and have expressed a desire to do something to alleviate the situation. But, for reasons given, which are not always reconcilable, nothing has been accomplished in that direction, and, so far as we are informed by the record, nothing is likely to be accomplished during the life of the defendant's charter. In the first report, of the first president, made to the directors in 1879, he said:

"Although the water delivered to consumers is heavily charged with "sediment, my first study was devoted to supplying an abundance, "such as it is, leaving the problem of clear water to be solved after "this has been accomplished. The delivery of filtered water from the

" Mississippi river is an acknowledged possibility, through subsidence " and filtration, but the expense attendant thereon must deter us from " adopting this system at present."

The following year, according to the report of the same officer, provision had been made for the " abundance " to which he referred in his previous report, but the expense still stood in the way of any action toward improving the quality of the water. And the same condition was reported in 1881, and 1882. A new president was then installed, but, in the meanwhile, a litigation had arisen between the city and the company (involving the question of the liability of the company for taxes, on the one hand, and of the city for its water supply, on the other), the pendency of which seemed to operate as a bar to any steps in the direction of better water, the president reporting upon the subject, in April, 1884, as follows, to-wit:

" It is feasible and practicable for our company to supply the city "with crystal clear water. Experiments, conducted by Mr. L. H. " Gardiner, during the past eighteen months, have demonstrated, to the " satisfaction of the directory, the practicability of thus clarifying the "water of our river and of thus supplying our people with a water " inferior to none, and superior to most public supplies, from what- " ever source derived. Settling reservoirs adapted to this system have " been designed by Col. Cook, to be erected on grounds already owned " by the company. Their cost, and that of the machinery, etc., is " entirely within the limits of prudent investment for such a purpose. " If the relations of the company to the city can be equitably deter- " mined, and the letter and spirit of the charter of the company fairly " construed by the courts, in the now pending litigation, I shall " strongly advocate the adoption of the system for a clear water supply " above alluded to, to be furnished, of course, at our present tariff " rates    As matters now stand, the city is the beneficiary of our com- " pany to the extent of about half of the water we pump, and wants to " exact, additionally, the payment of a large assessment for taxes. " Pending these conditions, I do not recommend any improvement or " expenditure beyond what may be necessary for the maintenance of " our present system." The litigation thus referred to, eventually, resulted most favorably to the company; for, whilst it was held that the company was liable to the city for taxes, it was also held that the city was liable for all water furnished exceeding in value the amount of such taxes, collected, the result being, that, between 1884 and 1898, the

city collected $290,239.86, in taxes, and paid for water, which, by the terms of the company's charter was to have been furnished free, the sum of $931,191.26, making a difference of $640,951.40 in favor of the company, as compared with the result if both parties had conformed to the provisions of the charter as written. Nothing, however, has since been accomplished by the company in the way of improving the quality of the water furnished by it. Some years after the termination of the litigation above referred to, another corporation, engaged in the business of supplying filter plants, was allowed to make the experiment of pumping Mississippi river water through its filters directly into the defendant's distributing mains, with the understanding that should the experiment demonstrate the practicability of furnishing pure water. in that way, the defendant should pay for the plant erected for its purposes, and should, in any case, pay the actual cost of the experiment; and, the attempt proving unsuccessful, the company paid the cost, amounting to $25,000. In the meanwhile, the settling reservoirs, so frequently and confidently reported on, and by means of which, in 1884, the president assured the directors that crystal clear water cou'd be supplied "within the limits of prudent investment," have never been constructed, and all further effort on the part of the company to furnish pure water has been abandoned, to await the result of experiments which may be made, elsewhere.

In this connection, it is perhaps proper that we should state more distinctly the conclusion which we have reached, from the evidence before us, as to the character and availability, for ordinary purposes, of the water of the Mississippi river, as taken from that stream and supplied to the people of New Orleans by the defendant company. In a report made by the defendant's able superintendent to its president and directors, in April, 1888, that officer said: "The silt, or suspended "matter, carried by the Mississippi river varies from sixty grains to " fifteen hundred grains of solid matter per gallon. The character of " the silt is such as to rapidly cut and wear the working parts of all " machinery." "Silt" is defined to be "mud, or fine earth, deposited from running or standing water." (Webster's International Dict.) It is also shown that the suspended matter referred to consists, in part, or, at times, of "kaoline," a finely-divided white clay, and that the result of the admixture of silt, kaoline and water, is, in this instance, a tawny, opaque, fluid, which is not only injurious to machinery, but is undesirable for any, and totally unfit for most,

domestic uses—even the washing of banquettes or the scrubbing of floors. Upon the other hand, it is conclusively shown that, when the material that is carried in suspension is removed, whether by precipitation or filtration, the water becomes clear, and is uncommonly pure and wholesome, the reason therefor being, that for several hundred miles above New Orleans there is no surface drainage, the source from which streams derive most, if not all, of their organic matter, into the Mississippi river, and that such matter, of that description, as may have been swept into it, higher up, is eliminated during the passage of the water over that distance, by constant agitation and attrition in contact with the inorganic substances, carried in suspension, and with the oxygen of the atmsophere. A large percentage of this inorganic material is, however, left behind, and, whilst it is said by some of the witnesses that the water is none the less palatable and wholesome on that account the weight of the evidence is the other way, and we find nothing in the record to justify the conclusion that any one in New Orleans, habitually, drinks river water with its mud in it, or that a fluid that is capable of destroying machinery, made of iron or steel, can, with impunity, be taken, as a beverage, into the human system. The evidence, taken on behalf of the defendants, shows that, whilst Mississippi river water is highly esteemed by mariners visiting this port, it is not so used, the same witness who testifies that it is considered the "finest in the world for sea-going purposes," also says: "We always used to settle it before stowing it for sea-going purposes." Our conclusion, then, may be summarized in the following excerpt taken from a report made by one of the defendant's presidents to its board of directors, in April, 1882, to-wit: "Dr. Joseph Jones, in his "able report of 1881, says, that in the year 1870, samples of the waters "of the Mississippi river were submitted to him for chemical and "microscopical analysis, and from his examination, he concluded that, "when freed from superficial matter, they are of great purity and will "compare favorably with the drinking water supplied to the largest and "best regulated cities."

Upon the question of what was done by the defendant, within the limit of time fixed by its charter, to extend its works and furnish a supply of water, adequate, as to quantity, a great deal of testimony was taken, the consideration of which, for reasons which will sufficiently appear hereafter, we pretermit. And we now proceed to an examination of the facts, as disclosed by the record, touching the rates

charged by the defendant and its alleged discrimination between con-
sumers.

We have seen that the ordinance, passed by the city council in 1870,
proposing lower rates than those established by the Hatch tariff was
never promulgated, and we have also seen that it is practically demon-
strated that the Hatch tariff was, nevertheless, abandoned by the city,
and a much lower rate adopted, long before the transfer of the water-
works to the defendant. It is not improbable that the tariff, as thus
adopted and enforced by the city, during the last few years of its
administration of the works, conformed, in the main, though not alto-
gether, to that embodied in the unpromulgated ordinance of 1870; but,
of this we cannot be sure, as the most important books, showing the
charges and collections made by the city, have been lost; the defendant,
to whom they were delivered, with the works, and who had possession of
them for several years thereafter, being now unable to account for
them. Taking the evidence as we find it, it appears that, during the
first four years of the defendant's administration, the proviso con-
tained in Section 15 of the act of 1877, which reads; "*and provided
further,* that the rates charged shall never exceed those now paid by"
(to) "the city," etc., was construed to mean that the company should
not charge more for water than was charged by the city, before, and
at the date of, the transfer of the works; and during that period, the
charges were regulated accordingly. Such is the positive, uncontra-
dicted, testimony of the gentleman who, during those years, occupied
the position of president of the defendant company. And his testi-
mony is corroborated by the figures, which we find in the record, show-
ing the quantity of water pumped and the receipts from the sale of
the same, as compared to the pumpage and receipts under the city
administration. We will not go over these figures in detail. It is suf-
ficient to say that the average receipts from water rates during the
last five years of the city's administration were $98,513.23, and the
average receipts during the following four years (being the first four
years of the company's administration) were $93,601.95, whilst the evi-
dence points strongly to the conclusion that the company pumped more
water during that time than had been pumped by the city. The record
does not show how much was pumped during the years 1874, 1875 and
1876, but it appears, as has, heretofore, been stated, that, in 1877, the
city pumped 2,408,591,230 gallons, for which she received $90,148.62;
and it also appears that during the year ending in April, 1882, (being

the last year of the company's first four years of administration), there were pumped 2,948,347,134 gallons for which the company received $99, 930.70, the average, per thousand gallons, received by the city being 37.4 cents, and the average received by the company being 33.8 cents. That the company received less than the city, though pumping more water, is accounted for by the fact that there had been a large waste, resulting from leaks in the reservoirs, amounting, according to the estimate of the president of the company, to 600,000 gallons per day. The financial results thus obtained were unsatisfactory to the stockholders, who, in 1882, elected a new president. And the evidence justifies the conclusion that the company, then, deliberately, abandoned the tariff of charges for water which had been enforced by the city, and by which it had, theretofore, regulated its own charges, and established a new tariff, according to which the rates were much higher. There was little or no noise made about this change of policy, but the results were soon to speak, and have spoken, for themselves. During the year 1883, the company pumped 2,900,549,214 gallons of water, as against 2,948,347,134 gallons the year before, and received $111,794.19 as against $99,930.70, received the year before; thus pumping nearly 50,000,000 gallons less water, and receiving nearly $12,000 more for it. And the president, in his annual report, used the following language, to-wit:

"The earnest attention of the directory has been engaged in plans " for an improvement in the character of the water we furnish; to au " improvement and reorganization of the system of records and gen- "eral conduct of current business; *to the maintenance of a proper and* " *reasonable advance in the great majority of the assessmnets,* and their equalization. * * * The assessments, (which seem to have been " governed by no fixed rule), when compared with the tariff, have been " found too low. Correction, increase and equalization have created " more or less dissatisfaction. *An increase has been established, how-* " *ever, and the company is still far within the limits of its authorized* " *tariff.*" (Italics by the Court.)

In April, 1884, the president reported that he had caused the premises of each consumer to be inspected, and he, thereupon, proceeded, as follows, to-wit:

"The systematic inspection alluded to gave data and basis for a " material increase in the general assessment. Special care has been " taken to have all the assessments fall within the limits of our author-

" ized tariff, and at the same time bear an equitable relation to each
" other in the various classes of water takers.    *    *    *    The people of
" New Orleans have proved willing, after a little natural remonstrance,
" to pay a fair price for water supplied by the company, as is shown
" by the fact that the collected revenue is $17,000 above that of the
" preceding year."

During the year to which this report referred, the company pumped
2,759,022,884 gallons of water for which it received $127,228.50, being
an average of 45.7 cents per thousand gallons.    During the year ending
in April, 1885, the company pumped a total of 2,442,611,478 gallons, for
which it received, from private consumers, $129,876.08, and from the
city of New Orleans, $17,085.60.    Averaging the total amount of water
pumped by the amount received from private consumers, only, and
we find the charge to have been 53 cents per thousand gallons; whilst,
if we include in the calculation the amount received from the city, the
average charge per thousand gallons was 59 cents.    During the year end-
ing in April, 1886, the company pumped 2,169,399,232 gallons of water,
for which it received, from private consumers, $123,228.73, and from
the city, $64,239.60.    Averaging the total amount of water by the
amount   received   from   private   consumers,   only,   and   the   charge
amounted to 56 cents per thousand gallons, and if the amount received
from the city be included, the average charge, per thousand gallons,
was 86 cents.    It will thus be seen that, within the four years follow-
ing its change in policy, the company, upon the face of the reports
made by the president to its board of directors, had raised the average
charge for water, per 1000 gallons, about 50 per cent above the rates
previously charged by the city, in 1877, and that, including the amount
received from the city, the company received an average of nearly two
and a half times as much per thousand gallons, for water pumped in
1886, as the city received in 1877.    During some later years, a com-
parison of the gross pumpage with the gross receipts may not, always,
disclose the same high average, but this was not because the charge
was not made, but for other reasons; as, for instance, in January, 1892,
the superintendent reported that the record showed that the company
pumped 100,000,000 of gallons more in November, 1891, than in
November, 1888, whereas the extra quantity was neither pumped nor
delivered, but was registered by reason of the defective condition, and
"slippage," of the pumps.    When that condition began, and how long
it lasted, it would be useless to inquire.    The facts which have been

stated are sufficient, more particularly when considered in connection with the testimony to which we will refer a little later. What the president of the defendant company meant when he stated that the charges for water, established and enforced by the company, were "within the limits of its authorized tariff," the record does not enable us to say. It is quite certain that those charges did not, and do not, fall within the limits of the tariff established by the city, and in force when the charter of the company was adopted, as is shown by the books of the city which were delivered to the company, and served as its guide in the matter of its charges during the first four years of its existence; and if any other tariff was authorized, evidence of that fact has not been produced. The "dissatisfaction," to which the first report refers, resulted in something more than "the little natural remonstrance," mentioned in the second. Isaac Levy, a rice miller, had been paying $150, *per annum*, for his supply of water, under the city administration, and his rate had been increased to $175 upon the accession of the company, to which he made no objection, as the latter amount was within the tariff established by the city. In 1883, however, the company, under its new administration, increased the charge to $400, whereupon Levy filed suit, complaining that the charge was illegal and praying that the company be compelled to accept the amount to which it was entitled, and that it be enjoined, in the meanwhile, from cutting off his supply of water. And it was finally decided, in 1886, that the company was entitled to charge no higher rate than the city had charged upon March 31st, 1877, (the date of the approval of the Act No. 33 of that year); that the rate then charged by the city, to consumers such as Levy, was fifteen cents per thousand gallons, and that the amount demanded by the company was in excess of that rate, and, therefore, unauthorized and illegal. State ex rel. Water Works Co. vs. Levy, 38 Ann. 25. The judgment thus rendered was affirmed, in 1887, in the case of Ernst vs. Water Works Co., 39 Ann. 550; and suits brought by several other litigants, and not appealed, appear to have been settled upon the same basis. Upon the trial of the Levy case, the president of the company, who had administered its affairs during the first four years, testified that, during that time, the rates charged by the company had been regulated by the rates as he found them in the books of the city; and that the rate charged by the city, for water furnished in quantity and by measurement, was 15 cents per 1000 gallons; and he referred the counsel of the company to the books

of the city, which were then in the possesson of the company, in verification of his statement. Whether the books were then produced in court, we are unable to say from the record now before us. If they were, the result shows that their contents sustained the testimony of the witness. If they were not, it is fair to presume that it was because the company, though in possession of them, did not find it to its advantage to produce them. Since that time, the books have been lost, and as the memory of the witness who then testified as to their contents has become somewhat uncertain, after the lapse of years, it would be difficult, perhaps impossible, now, to prove what rates were charged by the city in 1877, and the defendant would have a wide latitude in the matter of its charges were it not that the testimony given in the Levy case has been preserved and affirmed by the witness who gave it. After having had its day in court, in the several cases referred to, the defendant, apparently, acquiesced in the result reached, and, as late as November, 1890, the superintendent, in his monthly report to the president and directors, referring to a controversy which had arisen with a large consumer, informed them that he had consulted the attorney of the company as to the rate per thousand gallons that could be charged, and that, quoting the language, "he says that 15 cents per 1000 gallons "having been fixed by the Supreme Court as the legal rate to charge "consumers, this is the rate under the circumstances. I have rendered "a bill in accordance, etc." He also, in the same communication, recommended that certain other consumers, whom he names, should be charged at the same rate. But there were, and are, still other large consumers who were, and are, charged rates greatly in excess of that obtained by those with whom the controversy had arisen, rates in conformity to a tariff published by the company itself, and to which its president, presumably, referred, in speaking of its "authorized" tariff, but which fixes 15 cents per 1000 gallons as the minimum rate to large consumers, taking water by measurement, whilst the maximum rate to such consumers is 35 cents per 1000 gallons.

These rates conform neither to the Hatch tariff nor to the tariff contained in the unpromulgated ordinance of 1870, and they are largely in excess of the tariff enforced by the city in 1877; and, so far as this record discloses, there is no other authority for them than that of the company itself, exercised in plain disregard of two decisions of this court, rendered in cases to which the company was a party, to the effect that they are unauthorized and illegal. Beyond this, we find, in

the pamphlet containing the tariff thus published by the company, the following rules prescribed to consumers of water, to-wit:

"Meters will be of such make and size as will be approved by the " Water Works Company, and will be furnished and maintained by " the consumer. * * * The furnishing of water through meters " will be at the option of the Water Works Company." We also find that such meters as are permitted and approved by the Water Works Company, whilst quite expensive (those of medium size costing in the neighborhood of $40), are rapidly cut and worn out by the action of the silt-bearing water, and that there is, consequently, great irregularity in their operation, so that one consumer, whose meter registers 1000 cubic feet, is charged with 7500 gallons of water, whilst another, whose meter registers the same quantity, may be charged with from 10,000 to 90,000 gallons, or any other quantity. And this, too, at the rate of 35 or 40 cents per thousand gallons, as against 15 cents per thousand gallons charged to the consumer whose meter measures only seven and a half gallons to the cubic foot. Thus, by way of illustration, a particular consumer, during a period of twenty-seven months, using an average of 730,000 gallons of water per month, was charged at the uniform rate of 15 cents per 1000 gallons, according to a meter which appears never to have measured more than seven and a half gallons to the cubic foot registered by it. And, at the end of that period, a flat rate of $700 per year was agreed upon, although, according to the minimum rate, by meter measurement, with a meter which allowed only the minmum quantity of water per registered cubic foot to pass through, the charge should have been $1,314. Another consumer, who during the ten months beginning February 1st, and ending November 30th, 1898, used an average of 2868 gallons per month, was charged, during four months, 40 cents, and during the other six monthe 35 cents per 1000 gallons, according to a meter which appears never to have allowed less than ten gallons to the cubit foot, registered by it, to pass through, and from that up to 28 gallons to the cubic foot. Again, one proprietor of a livery stable is charged a uniform rate of 20 cents per 1000 gallons, whilst another, doing about the same business, and not far distant, is never charged less than 25 cents per 1000 gallons, and from that to 45 cents per 1000 gallons; and still another, doing a somewhat smaller business, though taking his water by meter measurement, is charged 35 cents and 40 cents per 1000 gallons, and, all this, although the maximum charge for water so taken, even according to the defend-

ant's publish tariff, is 35 cents per 1000 gallons, to consumers using from 100 to 500 gallons per day. The evidence is equally conclusive to the effect that the flat rates, charged to the smaller consumers, have been advanced and maintained, by the company, in excess of those exacted by the city during the last year of its administration.

## OPINION.

The foregoing statement includes most of the facts, disclosed by the record, that we find necessary for the decision of the case. Others, which may be pertinent, will be incorporated in this opinion. Many facts have been pretermitted, because, if not wholly immaterial, they are, at least, unnecessary, to the particular issues upon which the case is to be decided. We have stated, in detail, the circumstances under which the defendant company came into existence, and the result of its establishment, regarded as an investment, in order that its exact relation to the state of Louisiana and to the city and people of New Orleans may appear fairly upon the record, inasmuch as the State, the city, the legislative committees which reported the resolution, under the authority of which this suit was brought, and the public officer by whom the suit was brought, have been made the subjects of criticism, in one of the printed arguments presented on behalf of the defendant, which appears to us to be wholly undeserved.

It will be seen from the statement, as thus made, that upon the organization of the defendant company, the city of New Orleans held $1,169,500, out of a total of $1,671,000 of its stock, actually issued, being also a majority of all the stock called for by its charter, but consented, nevertheless, that the control of the corporation should be vested in the minority stockholders, representing, at that time, but $501,600 of the stock; and that, not only was the entire water works plant, which the city had acquired from the Commercial Bank, together with the extensions and improvements which had been made during the city's administration, turned over to the corporation so controlled, but that there were included grants of power, from the State, which gave to that plant its principal value, viz: the power to operate it in a corporate capacity; to expropriate private, and to appropriate and use, public property as the business of the company might require; the monopoly with respect to the water to be supplied to the City, and people, of New Orleans, for fifty years; and other powers and privileges, which need not be particularized. So that, the holders of the

bonds, which had been given in payment for the bare plant, after the franchises necessary to its operation had expired by limitation, were enabled, with the same bonds, and without additional cost, to re-acquire all the property sold by them, somewhat enlarged and extended, together with privileges worth far more than the property itself. The bonds in question, and the stock for which they were exchanged, were, at that time, worth thirty-three cents on the dollar. When, therefore, at the end of the first year, the company declared a dividend of 2 per cent. it represented 6 per cent. upon the money actually invested; and the dividends of five per cent. which have been declared of late years, have represented fifteen per cent upon that original investment, and have been paid with such regularity that the stock has commanded a premium, exceeding one-fourth of its par value. The owner of the stock, acquired according to the terms of, what is called a "hard bargain," driven by a sovereign state, descending to the level of " a common trader," has therefore gained, up to the present time, nearly three times the amount of his investment, by reason of its appreciation in value, and, almost, if not quite, as much more, in the meanwhile, in the way of dividends, declared from year to year.

There are, no doubt, many of the present stockholders, perhaps a majority of them, who have acquired their holdings by purchases in the market, who have paid the ruling price for their stock, and who have realized but a fair profit upon the money invested; and our remarks in this connection, are intended for no other purpose than to show that the company was not driven by the State into making a bargain, and that the bargain as originally entered into was not a hard one, as is charged.

In 1882, the city of New Orleans sued for taxes, from the payment of which, under Section 4 of the Act of 1877, the defendant was declared to be exempt; and the defendant, by way of reconvention, prayed judgment for the value of the water furnished to the city, which the same section declared should be furnished free of charge. It was decided by this court that the exemption from taxation was unconstitutional, but that the city should pay for its water, up to an amount equal to the taxes recovered, leaving upon the defendant, however, the obligation to furnish the water required, exceeding that amount in value, free of charge. City of New Orleans vs. Water Works Company, 36 Ann. 432.

Thereafter, the General Assembly passed an act (No. 56 of 1884)

requiring the city to pay for all the water obtained by it in any year for which it might claim and recover taxes from the company. And a contract, made pursuant to that legislation, having been sustained by judgment lof this court (Conery et als. vs. Waterworks Co. et als., 41 Ann. 913), the city has since then, up to 1898, paid a total of over $900,000 for its water supply, as against less than $300,000 received for taxes. It was, moreover, held that the act of 1884 was not passed for the benefit of the defendant, but was an act intended to regulate the conduct of the city of New Orleans in certain respects, and that, when the city, agreeably to the terms thereof, agreed to pay for water, to which it was, under the previous decision of this court, entitled, free of charge, there was no such acceptance of benefit or waiver of obligation, on the part of the defendant, as to bring it within the provisions of the constitution, and thereby deprive it of its monopoly, or any other franchise, which it could not, under such circumstances, have continued to enjoy.

We now procede to inquire whether the powers and privileges conferred on the defendant, and from which it has derived such advantage, have been exercised in conformity to the conditions of the grant. It is part of the statement of facts, which precedes this opinion, that the water which the defendant furnishes and which it claims the right to furnish, at its option, whilst susceptible of clarification and purification, is neither clear nor pure. That fact has not only been recognized by the defendant and its officers, and by public officials and analytical chemists, but by the state of Louisiana in the very legislation under which the water is now supplied, to the exclusion of any better and purer water, to some 300,000 of her citizens. The act of 1877, within which, as amended by the act of 1878, the defendant lives and moves, as we have seen, is entitled " An act to enable the city of New Orleans to promote the public health, and to afford greater security against fire, by the establishbent of a corporation to be called 'The New Orleans "Water Works Company;' to authorize the said company to issue " bonds, for the purpose of extending and improving the said works, " and to furnish the inhabitants of New Orleans an adequate supply of " pure and wholesome water," etc.

This language plainly indicates that the attention of the law-makers was attracted to the question of the quality of the water to be furnished, and that the act to be passed would deal with that subject. It was no secret to them that the city of New Orleans had, for thirty-

five years, and more, been supplied with the water of the Mississippi river, as taken therefrom, and, if the proposed legislation contemplated only a continuation of the same supply the descriptive terms used were not only unnecessary, but inapplicable. But that such was not the purpose, is evident from the fact that the act confers upon the company the authority to obtain water elsewhere than from the Mississippi river, whereas its predecessor, the Commercial Bank, was restricted to that stream. Moreover, Section 5, confers upon the corporation the power "to construct, dig, or cause to be opened, any canals or ditches, whatever, for the purpose of conducting the water of the *rivers* from any place or places it may deem fit, and to raise and construct such dykes, mounds, reservoirs as may be required for securing and carrying a full supply of pure water to said city and its inhabitants," etc. And Section 9, provides that: "The Board of Directors shall have power * * * to borrow money for the purpose of improving and enlarging its works and increasing the supply of pure water; and to accomplish this, the said Board are hereby authorized to issue the bonds of the company," etc.

This use of the word "rivers," and of the adjective "pure"; the fact that the purpose expressed by the words, "improving and enlarging the works, and increasing the supply of pure water," is immediately afterwards referred to as "this purpose," rather than "these purposes," taken in connection with the title of the act, leave no doubt that the lawmakers contemplated that the corporation which they were creating should, at some time or another, either purify the Mississippi river water, if, it elected to obtain its supply from that stream, or else should bring water, which required no purification, from some other stream. The proposition that, whilst recognizing the fact that Mississippi river water, in its normal state, is not pure, they should nevertheless have undertaken to restrict a community, consisting of some hundreds of thousands of persons, to its use, as their main supply, for a period of fifty years, and should have undertaken to make a law prohibiting such community from obtaining a supply elsewhere during that period, seems inconceivable, and the argument that, notwithstanding that "pure water" is mentioned in both the title and the context of defendant's legislative charter, it is intended that it should be optional with the defendant, during the long period covered by that charter, to furnish either pure or impure water, as its interest may suggest, loses much of its force, when we consider, that if the word "pure" had been

entirely omitted, the right of the defendant to furnish water of that description would have been unquestionable. But, let us suppose that the contention on behalf of the defendant, on this point, is well founded, and that it was the deliberate purpose of the law-makers of the last generation to restrict the people of New Orleans, for fifty years (before the expiration of which period the population may increase to half a million), to the use of unpurified water, as their main supply, at the option of a private business corporation; let us suppose that, so long as the corporation fulfills its obligations under the contract, which is said to result from this law, the community affected is without remedy, and must deny itself all water, except that furnished by said corporation, at least, it must be conceded that no such result follows if the corporation disregards alike the obligations and the prohibitions of the contract from which, alone, it *could* follow.

It is not claimed that the defendant company was granted the monopoly in question, with its other privileges in derogation of common right entirely without conditions. And, if the law-makers intended that it should enjoy that monopoly and those other privileges they also intended that it should observe the conditions upon which they were granted. But, one of the conditions was, that the company should charge no more for the water furnished by it than was paid to the city upon March 31, 1877. The charter of the company, under which its monopoly and all other franchises are enjoyed, contains a plain, positive prohibition to that effect. And yet the evidence in this record shows that the company, from 1883 up to the present time, has grossly, deliberately and persistently, violated that prohibition, by the establishment and enforcement of a tariff of charges for water greatly in excess of that thus authorized; and not only so, but, whilst enforcing its excessive, unauthorized, and illegal charges, has unjustly discriminated between citizens and other corporations with respect to their supply of an element and a commodity, equally necessary to human existence and to human affairs. This violation of the law and of its charter obligations is not one the effect of which is confined to the company, as a business entity, or to the investment of its stockholders. It inures to their pecuniary advantage; but, in its operation, it oppresses, and has oppressed, and will continue, if allowed to continue at all, in perhaps even greater degree, to oppress an absolutely dependent public. In view of these facts, the law demands that the privileges and corporate life thus abused should be withdrawn. And it

requires no other law, and no other construction of law, than such as is found in, and authorized by, the Civil Code of this state, to reach such a conclusion.

C. C. Arts. 14, 18, 447; Atchafalaya Board vs. Dawson, 13 La. 497; State vs. New Orleans Gas Light & Banking Co. 2 R. 529. But the same law prevails in other jurisdictions, and the conclusion stated is sustained as well by the authorities furnished on behalf of the defendant as by those furnished on behalf of the plaintiff.

"A private corporation, created by the legislature, may lose its "franchises by a misuser, or a non-user, of them; and they may be "resumed by the government, under a judicial judgment, upon a *quo* "*warranto* to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation. Territt vs. Taylor, 9 Cranch 51.

Morawetz on Private Corporations, 1st Ed., Par. 640.

"It has accordingly been held, in various cases, that, if a corporation has assumed the performance of duties for the benefit of the public, generally, it cannot neglect the performance of those duties without incurring a forfeiture of its franchises."

"If a duty is prescribed by the charter of a corporation in express terms it seems that the company will hold its franchises upon the condition that the duty shall be performed; and, hence, an omission to perform will constitute a sufficient ground for declaring a forfeiture of the company's franchises."

"Any act of a corporation which is forbidden by its charter, or by "a general rule of law, and, strictly, every act which the charter does "not expressly or impliedly authorize the corporation to perform, is "unlawful; and if the doing of such act is an injury to the public, it "may be sufficient ground for declaring a forfeiture of the corporate "franchises." Morawetz, Par's. 643-5.

In New York it has been held to be sufficient ground to justify the forfeiture of the charter of an insurance company that such company had undertaken to carry on banking operations in violation of a general law prohibiting unauthorized banking. People vs. Utica Ins. Co., 15 Johns. 358.

In Pennsylvania it has been held that where a bank was prohibited by its charter from making loans at a greater rate of discount than one-half of one per centum, for thirty days, and from dealing in promissory notes, and it was shown that this provision had been wilfully and

repeatedly violated, there was sufficient cause for declaring the charter forfeited. The Court, through the Chief Justice, said:

"It may be affirmed, as a general principle, that where there has " been a misuser or a non-user, in regard to matters which are of the " essence of the contract between the corporation and the State, and " the acts or omissions complained of have been wilful and repeated, " they constitute a just ground for forfeiture." Com. vs. Commercial Bank, 28 Pa. St. 389.

In State vs. Commercial Bank of Manchester, 33 Miss. 497, the court, referring to a restriction in the charter of the bank with respect to the charging of interest, said: "The same law which gave her " existence imposed the restriction and prescribed to her certain rules " of action, which must be regarded as so many conditions annexed " to the grant, and as tantamount to saying to the bank ' you are now " endowed with certain rights and privileges which you can exercise " and enjoy during the period specified in the charter, upon condition " that you act according to the rules therein prescribed.' The rule " prescribed as aplicable to the case before us, is, that the bank shall " not take exceeding seven per cent. per annum discount on notes " having less than twelve months to run to maturity. This rule is " the law which must govern the case before us, and the replication " alleging, a course of business, persevered in for at least six months, " in palpable violation of this rule, presents, in our opinion, a good " cause for forfeiture."

It is said, however, on behalf of the defendant, that according to the terms of the charter, the only remedy in the case presented is to be found in that provision which authorizes the city of New Orleans to proceed by mandamus to enforce a reduction of charges. We do not so construe the law. Section 15 of the Act of 1877 reads: "That the Water Works Company shall have the right to fix the rates for water; provided, that the net profits of the company shall not exceed ten per cent. per annum, and shall publish annual statements of its business and condition; and that the City Council shall have the power to appoint a committee, of not less than five, who shall have access to the books of said company, and make such extracts from the same as they may deem necessary; and, in case the profit shall exceed ten per cent, the City Council shall have the right to require said company to reduce the price of water in such manner and in such proportion that the profits shall never exceed the above named rates; and provided further.

that the rates charged shall never exceed those now paid by" (to) "the city, and in case said company shall refuse compliance, the demand of said city may be enforced by mandamus." This section of the law is somewhat inartificially drawn, but we are of opinion that a reasonable construction requires that the "demand," which the city is authorized to enforce, by mandamus, should be held to relate back to the demand which the city had been previously authorized to *make,* to-wit, the demand for a general reduction in the price of water whenever the profits of the company exceed ten per centum per annum. It would be inadmissible to suppose that the individual consumer, who might be the victim of extortion practiced by the company, was to be left without remedy, and absurd to suppose that his remedy was to consist of the mandamus proceeding which the City of New Orleans was authorized, but not compelled to bring under the conditions stated in the act. Nor does the fact that such consumers might resist overcharge against them, and have actually and successfully done so, affect the rights and obligations of the state in the premises.

It is also said, that, whilst the petition alleges that the defendant has been guilty of charging more than was charged by the city during the period immediately preceding the transfer of the works, it is further alleged that the tariff then enforced by the city was that embodied in the ordinance adopted in 1870, and that, as said ordinance was never promulgated, it follows that the action must fall, on this ground. We do not concur in this reasoning. The first, and material, proposition of the State is, that the charges enforced by the defendant have exceeded those which were enforced by the city, and this proposition has been established by conclusive evidence. Beyond that, it is perfectly immaterial whether the charges enforced by the city correspond to those embodied in the unpromulgated ordinance or not.

The defendant was afforded the amplest opportunity, on the trial of this case, and it has had ample opportunity heretofore, in the Levy and Ernst cases, and in several other cases, to show that the tariff enforced by the city at the date of the transfer of the works, and in March, 1877, was other than as testified to by their ex-president; and if it was unable to make such proof whilst it had the books of the city in its possession, there is no reason to suppose that it can do so now, since those books have disappeared. Holding these views, we find it unnecessary to consider the other questions presented.

For these reasons, it is ordered, adjudged and decreed that the judg-

ment appealed from be annulled, avoided and reversed, and it is now ordered, adjudged and decreed that there be judgment in favor of the plaintiff, the State of Louisiana, and against the defendant, the New Orleans Water Works Company, decreeing the forfeiture of the charter and of all the franchises heretofore conferred upon said defendant corporation. It is further ordered that said defendant pay the costs of these proceedings.

BREAUX, J., concurs in the decree. PROVOSTY, J., takes no part, the case having been argued and submitted prior to his appointment on this bench.

---

## ON APPLICATION FOR REHEARING.

MONROE, J.—The first proposition contained in the brief filed in support of the application for rehearing is, that, "The Court erred in the statement" that the most important books, showing the charges and collections made by the city, have been lost, the defendant, to whom they were delivered with the works, and who had possession "of them for "several years thereafter, being now unable to account for them." The books thus referred to are those showing the rates charged by the city, for water furnished by measurement, as contra-distinguished from those showing the "flat" rates charged, to small consumers. It is not denied that they were delivered to the defendant, with the works, nor is it denied that they were in the possession of the defendant for several years thereafter, nor, yet, is it denied that they were called for by the plaintiff for the purposes of the trial of this case in the district court and that the defendant was unable to produce them. It is said, however, that the court has erred in attributing undue importance to the particular books mentioned, and in intimating, in the statement quoted, and throughout the opinion, that the defendant appears "in the very equivocal position of a spoliator of evidence."

We avail ourselves of the oportunity to say that it was not the purpose of the opinion handed down, nor is it the present purpose, to charge the defendant, either directly or by implication, with deliberately spoilating or suppressing evidence of any kind. We think, and we shall endeavor to show, more clearly than we have done, that the books in question bear such an important relation to this case, as to furnish, now, almost the sole measure of the obligations of the defendant and

of the right of the public and of the State in the matter of the charges for water supplied by measurement, and hence, that it was the duty of the defendant to have preserved them in safety and in such a manner as that the State and the public, as parties in interest, could at all times have obtained access to them; but, that the defendant has failed to discharge that duty, and that the loss of the books is attributable to it's gross negligence, the beginnings of which appear to have been co-incident, in point of time, with it's determination that it would no longer be governed, in the matter of it's charges, by the rates which had been paid to the city, and which were recorded in those books; and, for these reasons, that the defendant is not in a position to complain of any reasonable indulgence extended to the plaintiff in it's effort to establish the contents of the books by secondary evidence.

It was stated by one of the counsel for the defendant, in oral argument before this Court, that, by referring to the briefs in the cases of Ernst & Co., and Stewart & Rickert vs. N. O. Water Works Co., it would be found that the missing books had been brought up with the appeals in those cases, and had been filed, in the originals, in this court, fifteen years ago; and it was also stated that an unavailing search had been made for them in the clerk's office; and these statements are re-iterated in the brief which we are now considering. It does not appear that any such return was made to the *subpoena duces tecum* issued for the purposes of the trial in the district court, or that the search referred to was instituted at that time; and, as the "case" of Ernst & Co., with which that of Stewart & Rickert was argued in this court, was admitted in evidence on that trial, over the objection of the counsel for the defendant, who still insist upon their objection, and further insist that nothing was offered or admitted save the "record," we should hardly have expected that they would rely, as they are now doing, upon the briefs in that case, as showing that the defendant was able to account for the books which it was unable to produce when called upon, and this more particularly as it was stipulated that the transcript, in the case of Ernst & Co., on file in this court, should be used for the purpose of the appeal, and it does not appear that the briefs attached thereto were ever called to the attention of the district judge. We have, nevertheless, in response to the invitation of the counsel, examined the briefs in the cases mentioned, as also the transcripts, and, having extended our inquiry to the cases of Levy; Allen & Syme, Louis Ruch; and Warner & Hoelzel, against the defendant, which "cases" or

"records" were also offered in evidence on behalf of the plaintiff, we find the following state of facts, to-wit:

In the month of October, of the year 1883, that being the second, business, year, dating from April, 1882, of the administration of the waterworks under the defendant's new president, and of the operation of what that officer reported as *"a proper and reasonable advance " in the great majority of the assessments,"* the plaintiffs above named instituted suits in which they alleged and complained, that they were engaged in rice milling in New Orleans, and required steam power; that their only means of obtaining water for that purpose was through the works controlled and operated by the defendant, since the defendant was claiming and exercising the exclusive privilege of furnishing the water supply to the inhabitants of New Orleans; that, by law, and by the terms of it's charter, the defendant was bound to furnish the water required by them at the rates paid to the city upon March 31st, 1877, but, that defendant refused to receive payment at those rates, refused to furnish water unless much higher rates were paid, and had threatened to harass the plaintiff unless it's demands were complied with; and, that the plaintiffs feared that it would cut off their water supply entirely unless restrained from so doing, and they prayed for injunctions and for judgments decreeing that they were entitled to water at the rates paid to the city upon March 31st, 1877.

The Levy case was tried and there was judgment for the plaintiff from which the defendant appealed, and lodged its appeal in this court in October, 1885. The other plaintiffs were represented by the same counsel, and, beyond the issuance of the injunctions prayed for by them, further proceedings in their cases appear to have been, in the meanwhile, suspended.

Upon the trial of the Levy case, the rates charged by the city, as shown by the books in question, and as charged by the defendant during the four years immediately following it's acquisition of the works, were established by the testimony of the gentleman, who, during that time, had been the defendant's president. We make the following excerpt from that testimony: "Did you ascertain in any way the rates that had been charged by the city immediately previous to your taking charge? A. I was guided by that. Q. How do you mean? A. The assessment of the previous years. (Objection). Q. Were you informed as to what the assessments of previous years had been? A. I found them in the books. Q. Were the books containing those

assessments in the possession of the Water Works Company at the time you took charge? A. Yes, sir. Q. You say you were guided by them in making your assessments for the first year? A. Yes, sir. Q. Do you mean by that that you took those assessments? A. I do. Q. And proceeded to collect on that basis? A. I did, that, is, as much as possible. Q. How long was that course continued? A. Until the time I left there. (Cross-Ex.) Q. Did you leave those books with the waterworks company at the time you left? A. Yes, sir."

The transcript of appeal in the case in which this testimony was taken, and which by agreement of counsel we were to have used (subject to the objections urged) for the purposes of the instant case, cannot be found, and when the original opinion was prepared, not having taken into consideration the sources of information to which we are now referred, we were unable to say whether the books, themselves, had been offered. In the brief filed on behalf of the defendant in the cases of Ernst & Co. and Stewart & Rickert, however, we find the following statement, to-wit: "At this time," (*i. e.* when the Levy case was tried) " the books in which the water rates of the city were recorded were missing and could not be found. Since then they have been found and are in evidence in this case, being brought up in the originals, by stipulation." The cases of Ernst & Co. and Stewart & Rickert were tried in 1886, after the judgment in the Levy case had been affirmed on appeal, and there were judgments for plaintiffs, as in the Levy case, which were also affirmed on appeal. So that, in the Levy case, the books in question being missing, the plaintiff obtained judgment upon establishing, by means of the testimony of the defendant's former president, "the water rates of the city" recorded therein, and otherwise proving that the amount demanded of him exceeded those rates. And, thereafter, the books being produced and offered on behalf of the defendant, Ernst & Co. and Stewart & Rickert obtained like judgments, before another judge of the district court, and in this Court, upon establishing the same facts, *by means of the books,* as well as of the relevant testimony which had been given in the Levy case, and which was admitted by consent of the counsel on both sides; following which, as we understand the evidence, like judgments were rendered by the district court in the cases of Allen & Syme, Louis Ruch, and Warner & Hoelzel; and, from these last mentioned judgments no appeals were taken. The transcripts in the cases of Ernst & Co. and Stewart &

Rickert were lodged in the office of the clerk of this Court in March, 1887, and the judgments appealed from were affirmed in May of the same year. The books in question, brought up in the originals, and not incorporated in the transcripts, were, in all probability, not filed at all. If they were filed the records of this court fail to show it.

In any event, after the litigation, for the purposes of which they were deposited in the clerk's office, had terminated, the defendant, as the owner and depositor, was at liberty to have withdrawn them, and, as no one else had that right, it is not unreasonable to suppose, in the absence of evidence to the contrary, that the books were withdrawn by it, rather than that they should have disappeared by reason of any failure on the part of the clerk properly to discharge his duty as custodian. If they were so withdrawn, and have since been lost by the defendant, as they appear to have been lost during the trial of the Levy case, it is not surprising that the search recently made by counsel no doubt in the utmost good faith, in the clerk's office, was barren of results. If the defendant did not withdraw the books, after the cases of Ernst & Co. and Stewart & Rickert were decided, it seems to us that some explanation should be offered for it's failure to do so, for this court had, then, three times, decided that the rates paid to the city, *as recorded in those books,* were the rates by which the defendant was bound to regulate it's charges during the many years of its prospective existence, and the information afforded by the books was, therefore, of vital concern in the matter of the discharge by the defendant of it's obligations under its contract and of the protection of the rights of the state and of the city of New Orleans and its inhabitants, as parties to, and beneficiaries of, that contract, since, as the years pass, it can well be understood that it becomes not only difficult but impossible to obtain that information from any other source. Whether, therefore, the defendant withdrew the books, and lost them, or whether they have been lost by reason of it's failure to withdraw them, the indisputable fact is, that, having the exclusive control of records affording information by means of which it was bound to regulate it's charges for water sold by measurement, it has so exercised that control as to dispossess itself of those records and to cut off the parties against whom such charges are to be made from access to that information, and, having done so, it now assumes the right to enforce a tariff of charges established by itself.

It is said that the court erred "in using as evidence in this cause

the records in the cases of Isaac Levy and of others as against this defendant for the reason that the using of the records in said cases was objected to as being *res inter alios acta* and inadmissible in evidence, and admitted over objecton, and to which admission exceptions were noted and reserved; and that the evidence adduced in said causes was neither offered, nor admitted, in evidence on the trial of this case."

. The consideration, moving to the State, in the contract, the violation and non-fulfillment of which is the cause of action set forth in the petition of the State, was the defendant's obligation, among others, to furnish the inhabitants of New Orleans with water, at a certain price. The State alleges that the defendant has violated that contract, and the law, by exacting a price for the water furnished by it in excess of that so agreed upon and authorized. It can hardly be denied that the individuals, for whose benefit, and with respect to whose water supply, the State entered into the contract with the defendant, and granted to it the monopoly which it enjoys, are competent witnesses in this case to show that they have been overcharged and that they have complained of the overcharges, and it is admitted, in the argument, now presented on behalf of the defendant, that such individuals had, and have the right to go into court, contradictorily with the defendant, and without making the State a party, for the enforcement of that contract with respect to such overcharges. And, yet, we are told that the fact that those individual beneficiaries have obtained relief by means of judgments, against the defendant, decreeing such violations of the contract sued on to have been committed is irrelevant to the present issue. We do not find it necessary to discuss this proposition.

It is further contended that the offers made by the plaintiffs were of the "records" in the cases mentioned and that such offers did not include the evidence, and hence, that such evidence should not be considered for the purposes of the case now under consideration. It is only necessary to say, in answer to this, that we have not considered the evidence referred to except that of the ex-president of the defendant company, which, it is admitted, was specially offered.

It is said that "the court erred in admitting, or using, the alleged testimony of Edward Toby, alleged to have been given in the case of Isaac Levy vs. New Orleans Water Works Company, which alleged testimony was admitted over defendant's objection and a bill of exceptions reserved to the admission of the same, and this court also erred as to the weight and effect to be given to said testimony, if admitted."

In support of this criticism, it is contended that the typewritten document, purporting to contain testimony given by Mr. Toby (who is defendant's ex-president), in the Levy case, and offered as such, was not sufficiently identified, and this finds some support in the fact. But the Levy *"case"* and the *"cases"* of Ernst & Co. and of Stewart & Rickert were also offered, with the stipulation that the transcripts, in this court, should be used; and, whilst the transcript in the Levy case is missing, we find, in the trasncripts in the other two cases, the testimony of Mr. Toby, given in the Levy case, offered and admitted, by agreement; and, in the brief filed by the defendant's counsel, in the two last mentioned cases, to which brief we have been especially referred for the purposes of the present application, that testimony is reproduced and made the subject of criticism. It can hardly be said, therefore, to lack identification. But, it is said, the testimony was not admissible, *per se,* and the typewritten instrument would have been admissible "only as a memorandum, made by a third person, and recognized by the witness as constituting a correct repository of facts, which he, many years ago, knew to be true, and which facts were perpetuated in the document in question," therefore, as Mr. Toby was unable either to recognize the instrument or to remember the facts which it purported to perpetuate, the testimony should not have been admitted. Sir J. Stephens, in his "Digest of the Law of Evidence," states the common law rule applicable to the question to be, that "Evidence given by a witness in a previous action is relevant for the purpose of proving the matters in a subsequent proceeding, or in a later stage of the same proceeding, when the witness is dead, or insane, or so ill that he will probably never be able to travel, or is kept out of the way by the adverse party, or, in civil, but not, it seems, in criminal, cases, is out of the jurisdiction of the court, or, perhaps, in civil, but not in criminal, cases, when he cannot be found; *provided* in all cases: (1) That the party against whom the evidence is to be given had the right and opportunity to cross-examine the declarant, when he was examined as a witness: (2) That the questions in issue were, substantially, the same in the first as in the second proceeding: (3) That the proceedings, if civil, were between the same parties, or their representatives in interest. (4) That, in criminal cases, the same person is accused upon the same facts." Stephens Dig. Art. 32.

There is no doubt that the defendant in the instant case had the right, and the opportunity, to cross-examine the declarant when he was

examined as a witness, and that it availed itself thereof   The questions
at issue in the Levy case were, whether the defendant was charging
more for water furnished in quantities than had been paid to the
city, and whether, in so doing, it was violating the law of it's existence
and of the state; and it was upon those identical issues that this case
has been decided. It is conceded in the present argument that Levy and
the other rice millers had the right to bring their suits on the identical
contract, made, in their behalf, by the State, upon which the State,
itself, brings the present suit.   It is said, however, that the witness
was neither dead, nor insane, nor sick, nor inaccessible, but, when put
on the stand, was unable to identify the document purporting to con-
tain his former testimony, which had not been written by him, or to re-
member the facts therein stated.   Mr. Chase, in his edition of
Stephens' Digest, says: "There are three cases of refreshing memory:
(1) When the witness, by referring to the writing, is enabled to recol-
lect the facts, and can testify, in reality, from memory:   (2) When the
witness, after referring to the writing, does not recollect the facts
and yet remembers that he made or saw the writing when the facts
were fresh in his mind and that it then stated the facts correctly:   (3)
When the witness, after referring to the writing, neither recollects
the facts, nor remembers having seen it before, and yet, from seeing his
handwriting therein (as in signature, contents, or both), is enabled
to testify to its genuineness and correctness.

Chase's Stephens' Dig. Arts. 136, 341-2, *notes.*

But the reason upon which they are founded is somewhat broader
than the rules as thus stated by the text writers, and the courts have
not hesitated to appeal to the former when the latter have been found
too narrow for the case to be decided.   Thus, what matters it whether
the witness, who is unable to remember the facts testified to on the
former trial, identifies the instrument in which his testimony is pre-
served, or whether the genuineness of such instrument is established
by the admission of the person against whom it is offered, or in some
other satisfactory way, so long as the witness is able to say that the
testimony as given was true?   Mr. Toby could not have been expected
to identify a typewritten instrument which he had never before seen,
but he could testify, and he did testify in substance, that, if the testi-
mony contained in the instrument exhibited to him was that given by
him in the Levy case, it was true and he stood by it, though, by reason
of the lapse of time (fifteen years) and his age, he was no longer able

to remember the facts testified to. And that it was the testimony so given by him in the Levy case is abundantly shown by the admissions and evidence to which we have already referred.

"Where a witness has given his deposition, and, afterwards, upon being called to the stand to testify, his memory of the transaction fails, his deposition may be read in evidence by the party calling him." Jack vs. Woods, 29, Pa. St. 325.

In Lawson vs. Jones 61 How. Pr. 424, the question was, whether a party who had been examined on the first trial and was rendered incompetent by the death of his adversary before the second trial could have his testimony, given on the former trial, read at any subsequent trial, and Judge Daly (of the Court of Common Pleas of N. Y., the entire bench concurring) held, that "There is no substantial reason why the testimony in such trial should not be read. The party was on the stand, and could have been cross-examined, and the same opportunity for scrutiny and for contradiction existed as if the jury had agreed upon a verdict. The objection, taken upon appeal, that the testimony cannot be read by the stenographer, who took it down on the former trial, from his notes, but must be produced in the form of depositions, reduced to writing and subscribed by the party, is not good. Such a rule would exclude all testimony taken in the manner authorized by law, and render the Code inoperative." Rice on Ev. Vol. 1, pp. 395-6.

We might say the same thing in this case, since the testimony of witnesses in civil cases is taken in most, if not in all, of the district courts of this state by stenographers, and is not signed by the witnesses. And this practice is recognized in other jurisdictions, where the rule referred to by Judge Daly, predicated upon the practice which had obtained before courts and litigants had begun to avail themselves of the services of stenographers has been disregarded. Thus, Mr. Bradner says: "A transcript made by an official stenographer and duly certified by him to be a *verbatim* transcript of his notes of the evidence given upon a former trial is admissible." (Citing, Bridgman vs. Carey, 62 Vt. 1; Com. vs. McCarthy, 152 Mass. 577; Com. vs. Doughty, 139 Pa. St. 383; Stege vs. State 127 Ind. 15; State vs. Byers 16 Mont. 565).

Bradner on Ev. 477, (and notes).

It is further suggested that the court erred in the matter of the weight and effect to which the testimony of Mr. Toby is entitled, and we

are invited to consult the brief filed by the defendant's counsel in the "Edwards' record as showing the contents of the missing books, excerpted in rebuttal of that testimony. This is probably a typographical error, and we assume that the counsel is referring us to the brief in the case of "Ernst & Co.," in which we find excerpts such as those indicated. But this court had before it at that time not only the excerpts made by the defendant's counsel, and other excerpts made by the counsel for the plaintiff, but it had the books themselves, as also the testimony of Mr. Toby, and it, nevertheless, reached the same conclusion as had been reached in the Levy case, the judgment in which was predicated upon the testimony of Mr. Toby, without books or excerpts. We find nothing in the case as now presented, therefore, to justify us in holding that we, or our predecessors, have committed the error suggested.

It is said that "the court erred in multiplying by ten (through a clerical error) the average amounts realized by the defendant from the sale of water by it pumped from the Mississippi river and distributed through its mains to the people of the city of New Orleans, which clerical error is vitally important, because, apparently, showing a revenue derived by defendant from it's sales of water ten times greater, in the average per gallon, than justified by the evidence, even as construed by the court." This error is admitted, but it does not affect the conclusion reached. The purpose was to show that, from a certain date, the defendant received more money for less, or for an equal quantity of, water, than had been received, by the city, and that the average amount received per gallon, was larger. In order to establish the latter proposition, the total amounts received by the city and by the defendant were divided by the number of gallons pumped by them, respectively, and the quotients were stated in tens when they should have been stated in units. As the same error was committed on both sides the only cause of complaint lies in the fact that it was made to appear that the average amount, per gallon, received by both the city and the defendant, was larger than it really was. Beyond this, we agree with the learned counsel that the proposition as demonstrated, to-wit: that the defendant received more money for less water and a larger average price, per gallon, than the city, would be insufficient, in itself, to support the judgment rendered. The fact proved was, however, merely one of a number, leading to the same conclusion, and used in a process of inductive reasoning to establish that conclusion. It might have

been omitted and the result would have been the same.

It is said that the court erred "in finding that the rates charged by the defendant are, or were, at any time, greater than any city tariff, or alleged city tariff, either the so-called "Hatch" tariff, or the alleged tariff of 1870, and that there is no evidence in the record showing or tending to support such finding." No attempt was made to show that the rates enforced by the defendant exceeded those established by either of the tariffs mentioned. On the contrary, it was distinctly held that the "Hatch" tariff had been abandoned; that the tariff of 1870 had never become operative; and that the only question to be determined was whether the defendant's charges have been in excess of those *actually made by the city, in March, 1877, as shown by the books of the city.* The defendant's president, elected in 1882, referring, in his annual reports from time to time, to the "dissatisfaction" and "little natural remonstrance" which resulted from his advancing the price of water, was at some pains to say that the advances were within the company's *"authorized tariff."*

The learned counsel, in a brief heretofore filed in this case, said: " Whilst we contend that the 'Hatch,' or 'Bragg,' tariff was, unques-" tionably, the one in force in 1877, still, we cannot see that, ' in so far " as this particular case is concerned. it will make much difference " whether the one or the other" (the Hatch tariff or that of 1870) "be " adopted, because there is scarcely a bill, of the five hundred, or more, " offered in evidence by the plaintiff, which is as high even as the rates " allowed by the alleged tariff of 1870." The gentleman who, as president of the company, administered its affairs during the four years, from 1878 to 1882, immediately succeeding it's acquisition of the works, gave the following testimony in the Levy case, whilst under cross-examination, in 1885, by one of the present counsel for the defendant, to-wit:

" Q. Do you know anything about any Bragg tariff? A. There " was a tariff, I think it was the 'Hatch.' General Bragg was in charge " of it during the city administration. Q. What do you know about " that? A. Well, that had been abandoned. Q. By whom? A. By " the city. Q. How do you know? A. By the books, by their " hydrant books. Q. Tell us in what instance they had abandoned it? " A. Because they had reduced their charges, they had been greatly " reduced and the city had been reducing it for several years. Q. " What do you mean by the city? A. The City Administrator of Water

" Works.   Q.   When did· they abandon it ?   A.   The books show that.
" They were the only evidence I had of it, for a year before I took
" charge."   It is also shown, as we think, that the rates charged by the
city in 1877 were lower than those established by the unpromulgated
tariff of 1870.   In view of this testimony and of the express prohibi-
tion in the defendant's charter to the effect that it should charge no
more for water than was *actually paid to the city in March*, 1877, it is
difficult to understand how it can be contended that the "Hatch" tariff
was in force at that date, or that the defendant could have had any
other "authorized tariff" than such as was · to be found, and as the
defendant actually found during its first four years of existence
recorded in the books of the city.

It is said that the court erred "in applying the vague term 'large
" consumers,' not only to Isaac Levy, and the other rice millers, simi-
" larly situated, who sued for a reduction of water rates, in 1884, or
" thereabouts," (the suits were brought in October, 1883,) "but to
" consumers using far less water than said Levy and others, and "in the
" failure to find what was meant by 'large consumer,' and who " was
" entitled to be considered as a 'large consumer.' "   The whole course
of the defendant, since 1882, and the arguments which it's counsel have
addressed to this court in the instant case show that it has proceeded
upon the theory that because there was no regularly adopted and pub-
lished tariff in force at the date of it's acquisition of the works, the
prohibition against it's charging more for water than was actually
paid to the city at that time must be read out of it's charter and held
to be of no effect; and, the books showing what was so paid having
been lost, whilst under its control, the most strenuous effort has been
made to exclude probably the only evidence which is now obtainable as
to their contents.   That evidence was introduced in the Levy case in
the absence of the books; and, in the absence of the books, the district
court and this court found that Levy, who was shown to have consumed
1,237,500 gallons of water during the milling season, of eight months,
was overcharged, and that he was entitled to water at the price which
he, and others similarly situated, had paid to the city, to-wit:   at the
rate of 15 cents per thousand gallons.   Referring to the judgment
appealed from, this court said:   "The judgment is based on as reliable
" *data* as can be obtained.   It is more favorable to the company than
" the computation warrants, but the plaintiff does not complain."   Levy
vs. Water Works Co., 38 Ann., 28.·   The cases of Ernst & Co. and of
Stewart & Rickert were afterwards tried. *with the books*. and. also. with

the testimony, as to their contents, which had been given in the Levy case. What the books showed was, in view of the decision which had been rendered in the Levy case, the most important question to be decided, and it was elaborately argued. In one of the briefs to which we have been referred (that of the plaintiff's counsel) it was said: "Your Honors, by examining those books may see that, although "charges over fifteen cents a thousand gallons were made for water "where the annual consumption was less than a million gallons, yet "there is no case where the consumption of water was over a million "gallons where the charge was over fifteen cents per thousand gallons." In the brief filed on behalf of the defendant this statement was contested, and what purport to be extracts from the books were reproduced, and it was said, in regard to them: "The extracts cover a period of time "when the city used meter measurements in estimating quantity. The "average highest charge per thousand gallons during the period of "meter measurements was 26½ cents. The average lowest 21 cents. "The average amount paid for water 23⅕. The highest rate shown "on the tables was 40 cents per 1000."

Turning to the extracts referred to we find that they begin with water furnished in 1868 and that some of them show the charges made in 1876 and 1877, and others do not. In any event, it is evident that the averages thus arrived at had nothing to do with the question before the court, which was, what was the amount charged upon March 31st, 1877? And it must have been so considered since the position of the plaintiffs was sustained and there were judgments in their favor. It was, therefore, judicially ascertained, contradictorily with the defendant in the cases mentioned, that a person who used 1,237,500 gallons of water, or more, in eight months, was entitled to such water at the rate of 15 cents per 1000 gallons, and, although it was not held that a person using less would not have been entitled to it at the same rate, it seems fair to suppose, from the arguments presented, that a person using less than 1,000,000 gallons a year would have been required to pay a higher rate. These last mentioned cases were decided, as we have already stated, in 1887. The evidence in the instant case shows that, in 1894, the Cosmopolitan Hotel used 4,838,695 gallons of water for which it paid the defendant at the rate of 30 cents per 1000. It is said that this was an exceptional case, but no reason is given why it should have been so, except that the proprietor of the hotel paid his bills without objecting. That, we apprehend, is what the uncomplain-

ing mass of the people have been doing.  If, upon the other hand, we believed that the only fault of the defendant lay in exceptional over-charges we should be willing to attribute such overcharges to error or accident.  But such is not the case.  In 1898, the defendant, acting upon the theory that it was bound by no established rates, published a tariff of its own making, in which we find the following:

"For daily average of 100 to 500 gallons, per 1000 gallons, 35 cents.

" For daily average of 500 to 2000 gallons, per 1000 gallons, 30 cents.

" For daily average of 2000 to 4000 gallons, per 1000 gallons, 25 " cents.

" For daily average of 4000 to 5000 gallons, per 1000 gallons, 20 " cents.

" For daily average of 5000 to 10,000 gallons, per 1000 gallons, 15 " cents."

" Consumption above 10,000 gallons, daily, special rates."

From this it will be seen that a person consuming a maximum of 5000 gallons a day or 1,825,000 gallons per year was required to pay at the rate of 20 cents per thousand, which was five cents in excess of the rate for which it had been held, more than ten years before, that Levy was liable, though there was no appreciable difference in the aver-age daily consumption, and the gross amount consumed in the twelve months would be nearly 600,000 gallons more than was consumed by Levy, as the latter used the water during only eight months. - So, ac-cording to the defendant's tariff, a person consuming a maximum of 4000 gallons a day, or 1,460,000 a year, would be charged at the rate of 25 cents per thousand.  And yet, we think, within the meaning of the Levy case, and the other cases which have been decided against the defendant, and within any reasonable interpretation of the words, that a person who uses 1,460,000 gallons of water a year is a "large con-sumer."  Beyond this, for the purposes of the present application, we have made a further and more critical examination of a number of the books showing the flat rates paid to the city, in the years 1876-7 and 1877-8, by small consumers, and we have satisfied ourselves that there was no error in the statement, contained in the opinion handed down that "the flat rates charged to the smaller consumers have been advanced and maintained by the company in excess of those exacted by the city during the last year of it's administration."

The proposition that no decree of forfeiture should be rendered in this case, except upon a tender, by the State, to the defendant, of the

bonds which were given by it's stockholders in exchange for their stock, appears to us to be untenable. The defendant was established, as private corporations are usually established, by, and for the benefit of, its promoters, who held the bonds of the city of New Orleans, and as a measure of relief which, no doubt, many other creditors of the city would have been glad, at that time, to have had extended to them. The only consideration received by the State for the valuable privileges granted by it was the advantage which it was supposed would inure to a community of her citizens from the faithful discharge by the corporation of the obligations assumed by it, and the corporate and other franchises were granted upon the condition, that, if those obligations were not faithfully discharged, the franchises would be withdrawn. This was, and is, the law of this state, which entered into, and became a condition of, the contract, and the decree of forfeiture is merely the enforcement of that condition. Rehearing refused.